```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
JOHN HANCOCK LIFE INSURANCE                                        :
COMPANY (U.S.A.),                                                  :
                                                                   :
                              Plaintiff,                           :
                                                                   :
               -v-                                                 :   14-cv-6766 (KBF)
                                                                   :
BETTE KATZMAN, HAROLD M. HOFFMAN,                                  :   OPINION & ORDER
and AK LIFE INS. LLC,                                              :
                                                                   :
                              Defendants.                          :
                                                                   :
------------------------------------------------------------------ X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 17, 2015

KATHERINE B. FORREST, District Judge:

In this interpleader action, plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock") seeks to be discharged of its liability under John Hancock Life Insurance Policy No. 93 977 437 (the "Policy"), which insured the life of the deceased Alan Katzman for $1,250,000.00.  At the time of his death, Alan Katzman's wife, Bette Katzman, was the named beneficiary of the Policy.  John Hancock has previously wired $1,053,410.40 to defendants.  The dispute before this Court concerns the difference between the full amount of the Policy's death and benefit and what John Hancock has paid, which is $196,589.60.

John Hancock argues that it properly withheld the $196,589.60 because the Policy was in default when Alan Katzman died.  According to John Hancock, § 10 of the Policy entitled it to deduct unpaid monthly deductions from the Policy's death benefit prior to payment.  Defendant AK Life Ins. LLC ("AK Life"), an assignee of the Policy, argues that defendants are entitled to the full $1,250,000 death benefit.

As part of a settlement agreement between Bette Katzman, AK Life, and Harold M. Hoffman,[1] Bette Katzman has assigned her right to sue for the $196,589.60 in unpaid monthly deductions to AK Life. (See Hoffman Decl. ex. D ¶¶ 2-3.)

Now pending before the Court are cross-motions for summary judgment by AK Life and John Hancock. For the reasons that follow, AK Life's motion for summary judgment is DENIED and John Hancock's motion for summary judgment is GRANTED.

I. BACKGROUND

    A. <u>Factual Background</u>[2]

        1. <u>The Policy.</u>

On June 12, 2008, John Hancock issued the Policy, which is a universal life insurance policy, to Alan Katzman. (PSOF ¶ 6; PRSOF ¶ 1.) The Policy insured Katzman's life for $1,250,000.00, and its beneficiary was his wife, Bette Katzman. (PSOF ¶¶ 5-6; PRSOF ¶ 1.)

---

[1] Hoffman is the managing member of AK Life, and serves as its counsel in this litigation; he has previously served as counsel for defendant Bette Katzman, who was previously engaged in a dispute over ownership of the Policy with AK Life, which has settled. (See Declaration of Harold M. Hoffman, ECF No. 34 ("Hoffman Decl.") ex. D.)

[2] The following facts are taken from the Local Rule 56.1 statements submitted by the parties in connection with this motion for summary judgment and their supporting materials. (Hoffman Decl.; ECF Nos. 35, 39 ("PSOF"), 40 ("PRSOF"), 42-43.) The Court cites to the parties' factual submissions only when they support a factual proposition, cite relevant material, and are not contradicted in pertinent part by a counter-statement supported by citation to evidence that would be admissible. See Local Civil Rule 56.1(d); <u>Chimarev v. TD Waterhouse Investor Servs., Inc.</u>, 280 F. Supp. 2d 208, 223 (S.D.N.Y. 2003) (material facts set forth in a Rule 56.1 statement "are uncontested and may be accepted as true" where a Rule 56.1 counter-statement was "deficient" because it consisted solely of "blanket denials" and was "not supported by citation to any evidence"), aff'd, 99 Fed. App'x 259 (2d Cir. 2004). To the extent that a party's response fails to directly address straightforward a factual allegation, this failure is considered an admission as a matter of law. See Local Civil Rule 56.1(c); <u>Gubitosi v. Kapica</u>, 154 F.3d 30, 31 n.1 (2d Cir. 1998); <u>NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.</u>, 262 F.Supp.2d 134, 139 (S.D.N.Y. 2003). The Court notes that AK Life has not submitted a response to plaintiff's Local Rule 56.1 statement in support of its cross-motion for summary judgment.

The Policy features a flexible payment plan, under which the policyholder is permitted to make payments in amounts of their choosing at times of their choosing, rather than in fixed amounts due on fixed dates. (See PSOF ¶¶ 10-15; PRSOF ¶ 12.) So long as the amount of the premiums paid are sufficient to cover the costs of providing coverage, the Policy remains in force. (PSOF ¶ 14.)

When enrolling in such a flexible payment plan, the policyholder must select a "premium frequency," such as annual, semi-annual, or quarterly. (PSOF ¶ 15.) The Policy does not provide for policy coverage in the absence of premium payments on some periodic basis, or (as discussed below) recovery of premiums due at the time of death.

At the beginning of each premium frequency interval, the policyholder (or someone else designated by the insured) receives a reminder of their "planned premium," which is an estimate of the amount of money necessary to keep the Policy in force during the interval. (See PSOF ¶¶ 12, 16.) Alan Katzman opted for an annual premium frequency interval, and indicated that he intended to make annual payments, with a first-year planned premium of $88,750, and planned premiums of $60,019 for each year thereafter. (PSOF ¶¶ 7-8.)

When John Hancock receives a premium payment for a universal life policy, it credits the payment to the Policy's "Policy Value" (the intricacies of which are not relevant here) minus a premium charge of 8% of each premium paid. (PSOF ¶ 18; Hoffman Decl. ex. B ("Policy") §§ 1, 3.) So long as the Policy is still in force, monthly deductions are subtracted from the Policy Value to cover the Policy's various costs,

3

including the cost of insurance and administrative costs, regardless of whether John Hancock receives a premium payment during that month.  (PSOF ¶¶ 12, 25; Policy §§ 3, 8, 14.)

Each month, John Hancock computes the "Net Cash Surrender Value" of the Policy, which is the difference between the Policy Value and the Policy's "surrender charge," as defined in § 1 of the Policy.  (PSOF ¶ 27; Policy §§ 1, 3.)  If after subtracting the monthly deductions the Net Cash Surrender Value is less than or equal to zero, the Policy is in default.  (PSOF ¶ 29; Policy § 10.)  Under the terms of Policy, when it enters default the policyholder has a 61-day grace period during which he may pay the amount required to bring the Policy out of default.  (PSOF ¶¶ 32-33; Policy § 10.)  The Policy states that at least 30 days prior to termination of coverage, John Hancock will send notice of the amount required to bring the policy out of default to the policyholder's last known address, as well as to the assignee on record if John Hancock has a notice of policy assignment on file at its service office.  (PSOF ¶ 33; Policy § 10.)  If the amount required is not paid before the last day of the grace period, the Policy terminates on that day.  (PSOF ¶ 35; Policy § 11(a).)

The Policy contains two provisions governing what happens if the insured dies when monthly deductions have not been paid for.  First, § 6 of the Policy states, "[i]f the Life Insured dies during a grace period . . . the Insurance Benefit will be reduced by the amount that was required to bring the policy out of default . . . ."  (Policy § 6.)  Second, § 10 of the Policy states, "[i]f the Life Insured dies while the

policy is in default, then we will deduct from the proceeds all Monthly Deductions due and unpaid as of the date of the Life Insured's death." (Policy § 10.)

2. Alan Katzman's default and subsequent events.

John Hancock received Alan Katzman's final premium payment on March 12, 2010. (PSOF ¶ 37; PRSOF ¶ 2.) The Policy went into default on April 18, 2010, when John Hancock computed the Policy's Net Cash Surrender Value and determined that it was less than or equal to zero. (PSOF ¶ 30.) The next day, John Hancock sent a termination warning notice to Alan Katzman. (PSOF ¶ 36; PRSOF ¶ 2.)

On April 30, 2010, Alan Katzman transferred the Policy to his wife, Bette Katzman, and submitted a change of ownership form to John Hancock, dated May 3, 2010. (PSOF ¶ 40; see PRSOF ¶ 3.) John Hancock terminated the Policy on June 18, 2010. (PSOF ¶ 41.) On June 28, 2010, John Hancock sent Bette Katzman a lapse termination notice informing her that the Policy was terminated due to non-payment. (PSOF ¶ 42; PRSOF ¶ 4.) On or about July 19, 2010, Bette Katzman submitted a check to John Hancock for $14,500, the amount listed in the termination warning notice. (PSOF ¶ 43.) John Hancock returned the check and, in a letter dated July 29, 2010, explained that the Policy was terminated due to non-payment. (PSOF ¶ 44.)

On May 25, 2011, Bette Katzman brought an action in New Jersey state court seeking to have the Policy reinstated on the grounds that John Hancock had terminated the Policy one day before the 61-day grace period expired and she had never received notice that the Policy was in default. (PSOF ¶ 45; PRSOF ¶ 5.)

Bette Katzman and John Hancock settled the New Jersey state court action, as reflected in a stipulation so-ordered by the court on October 6, 2011 (the "2011 Consent Order"). (PSOF ¶¶ 50-52; PRSOF ¶¶ 14-15; Hoffman Decl. ex. O ("2011 Consent Order").)

The 2011 Consent Order contains four key terms. First, John Hancock agreed to withdraw the June 28, 2010 lapse termination notice. (2011 Consent Order ¶ 1.) Second, John Hancock agreed to reinstate the Policy, retroactive to April 18, 2010, the date on which the Policy had entered default. (2011 Consent Order ¶ 2.) Third, John Hancock agreed to provide Bette Katzman and her counsel with a "fresh, written <u>Policy Termination Warning Notice</u> . . . in compliance with Policy terms and provisions, specifying the minimum premium due and payable to maintain Policy coverage beyond a date no earlier than sixty-three (63) days from the date of the Warning Notice." (2011 Consent Order ¶ 3.) Fourth, the parties agreed to discontinue the New Jersey state court action. (2011 Consent Order ¶ 4.)

John Hancock did not send Bette Katzman a notice or a billing statement following the settlement. (PSOF ¶ 54; PRSOF ¶ 16.) For her part, Bette Katzman did not make any premium payments on the Policy. (PSOF ¶ 55.) On October 18, 2011, Bette Katzman sent John Hancock a change of ownership (absolute assignment) form purportedly changing the owner of the Policy from her to AK Life. (PSOF ¶ 56.)

Alan Katzman died on May 25, 2014. (PRSOF ¶ 18.) AK Life filed a claim for the Policy's death benefit. (PSOF ¶ 61; PRSOF ¶ 19.) Bette Katzman claimed

that she—not AK Life—is the beneficiary of the Policy. (PSOF ¶ 64.) John Hancock's records reflect that Bette Katzman is the owner of the Policy, and it informed AK Life of this fact. (See PSOF ¶¶ 57-60.) John Hancock stated that it would pay the death benefit to the proper beneficiary minus the unpaid monthly deductions.[3] (PSOF ¶¶ 65-66.) AK Life and Bette Katzman have since resolved their dispute over ownership of the Policy, as memorialized in a settlement agreement dated September 24, 2014. (See Hoffman Decl. ex. D.)

The amount of money required to take the Policy out of default on the date of Alan Katzman's death was $196,589.60, which represents all monthly deductions due and unpaid at that time. (See PSOF ¶¶ 66-67; PRSOF ¶ 20.) John Hancock seeks to be released, discharged, and acquitted of liability under the Policy through its payment of $1,053,410.40 in "Policy Proceeds" (PSOF ¶ 68), which is the Policy's $1,250,000.00 death benefit minus the $196,589.60 required to take the Policy out of default on the date of Alan Katzman's death.

B.    Procedural Background

John Hancock commenced this interpleader action on August 20, 2014. (ECF No. 1.) The action was initially assigned to Judge Kenneth M. Karas. John Hancock filed an amended complaint (the "Amended Complaint") on August 29, 2014. (ECF No. 9 ("Am. Compl.").) In essence, when John Hancock filed this action it sought (a) to pay $1,053,410.40 plus interest of 1.25% per annum into the Court; (b) to be discharged from all further liability under the Policy; and (c) an injunction

---

[3] In their written submissions, the parties refer to the unpaid monthly deductions as "back premiums" or the "Policy Charges."

restraining Beftte Katzman, Hoffman, and AK Life from instituting any action against John Hancock with respect to the Policy. (Am. Compl.) AK Life filed an answer on October 31, 2014; it did not bring a counterclaim. (ECF No. 28 ("Answer").)

Bette Katzman, Hoffman, and AK Life entered into an agreement settling, as between them, their dispute over the Policy's ownership on September 24, 2014. (Hoffman Decl. ex. D.) As part of the settlement, AK Life, Hoffman, and Bette Katzman agreed that Bette Katzman is entitled to $600,000 of the Policy Proceeds, and that AK Life is entitled to the remaining balance of the $1,053,410.40. (Hoffman Decl. ex. D ¶¶ 1-2.) AK Life, Hoffman, and Bette Katzman also agreed that if AK Life is successful in recovering any of the $196,589.60 in unpaid monthly deductions at issue in this action, AK Life will receive 70% of the amount recovered, and Bette Katzman will receive 30%. (Hoffman Decl. ex. D ¶ 3.)

On November 13, 2014, AK Life moved for summary judgment in this action. (ECF No. 31.) On December 1, 2014, the Court so-ordered a stipulation and consent interpleader order directing John Hancock to pay Bette Katzman and AK Life $600,000.00 and $453,410.40, respectively, plus interest accruing at the rate of 1.25% per annum, conditioned on their tendering releases. (ECF No. 37.) AK Life did not release its claim for the unpaid monthly deductions,[4] which the Court said it would determine at the summary judgment stage. (See ECF No. 37.) John Hancock wired the funds to AK Life and Bette Katzman on December 12, 2014.

---

[4] The December 1, 2014 stipulation and consent interpleader order refers to the unpaid monthly deductions as the "Reserved Claim." (See ECF No. 37.)

(PSOF ¶ 74.) In doing so, John Hancock has wired defendants a sum of money equal to the Policy Proceeds.

John Hancock filed its opposition to AK Life's motion and cross-moved for summary judgment on January 9, 2015. (ECF Nos. 38, 41.) The motions became fully briefed on January 26, 2015. (ECF No. 44.) On March 6, 2015, this action was reassigned to the undersigned.

II.   LEGAL STANDARDS

    A.   <u>Summary Judgment</u>

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. <u>Id.</u> at 322-23. In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. <u>Price v. Cushman & Wakefield, Inc.</u>, 808 F.

Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

B.     Choice of Law

New York courts "seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006) (quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997)). In insurance contract cases, the Court evaluates factors such as the place where the policy was issued and delivered, the location of the broker or agent placing the policy, and the

place where premiums were paid.  See, e.g., Md. Cas. Co. v. Cont'l Cas. Co., 332 F.3d 145, 151-52 (2d Cir. 2003); Trade Organics USA, Inc. v. Md. Cas. Co., No. 06 Civ. 5494(WHP), 2008 WL 241081, at *2 (S.D.N.Y. Jan. 29, 2008) ("In the context of insurance contracts, New York courts also consider . . . 'the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business.'" (quoting Schwartz v. Twin City Fire Ins. Co., 492 F. Supp. 2d 308, 317 (S.D.N.Y. 2007))).  Here, all of these factors counsel toward applying the law of New Jersey to the facts of this case, and the parties do not dispute that New Jersey law should govern.  (See PRSOF ¶ 22; ECF No. 32 at 10-11 n.9; ECF No. 41.)

III.   DISCUSSION

John Hancock and AK Life dispute whether John Hancock is entitled to withhold the unpaid monthly deductions when paying the death benefit for the Policy.  AK Life's main argument in support of its position is that John Hancock may deduct the unpaid monthly deductions only if Alan Katzman died during a grace period.  However, § 10 of the Policy clearly and unambiguously states that John Hancock is entitled to deduct unpaid monthly deductions from the death benefit proceeds "[i]f the Life Insured dies while the policy is in default." (Policy § 10.)  As will be explained below, there is no triable issue as to whether Alan Katzman died while the policy was in default, and AK Life's various other arguments in support of its position lack merit.  Accordingly, summary judgment for John Hancock is appropriate.

A.     Legal Standard

Under New Jersey law, "[i]n interpreting the language of an insurance contract, a court must first attribute to the words their plain and ordinary meaning." Bd. of Educ. of Borough of Florham Park v. Utica Mut. Ins. Co., 172 N.J. 300, 307 (2002) (quoting Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)). "Indeed, '[i]n the absence of any ambiguity, courts should not write for the insured a better policy of insurance than the one purchased.'" Id. (internal quotation marks omitted) (quoting Gibson v. Callaghan, 158 N.J. 662, 670 (1999)). "[W]here the policy language reveals ambiguity, a court must resolve that ambiguity in favor of the insured" so as "to effectuate the reasonable expectations of the insured." Id.

B.     Analysis

The two provisions of the Policy that are relevant to the parties' current dispute are § 6 and § 10. Section 6 of the Policy, which is entitled "Insurance Benefit," states, "[i]f the Life Insured dies during a grace period . . . the Insurance Benefit will be reduced by the amount that was required to bring the policy out of default . . . ." (Policy § 6.)  Section 10 of the Policy contains a subsection entitled "Default Payment," which states, "[i]f the Life Insured dies while the policy is in default, then we will deduct from the proceeds all monthly deductions due and unpaid as of the date of the Life Insured's death." (Policy § 10.)  As explained above, the Policy is in default if after subtracting the monthly deductions the Net Cash Surrender Value is less than or equal to zero. (PSOF ¶ 29; Policy § 10.)

Together, § 6 and § 10 provide for belt-and-suspenders protection for John Hancock, giving John Hancock two separate though potentially overlapping bases

12

on which to withhold unpaid monthly deductions when paying out the Policy's death benefit: § 6 permits John Hancock to do so if the insured dies <u>during a grace period</u>; and § 10 permits John Hancock to do so if the insured dies when the Policy is <u>in default</u>. In most cases, these two scenarios will completely overlap, as the grace period is triggered by default, and the Policy terminates at the end of a grace period in which John Hancock does not receive the amount necessary to cure the default. (Policy § 11(a).) However, § 10 is broader than § 6—it potentially applies to situations where the Policy is in force and in default but, for whatever reason, a grace period has not run.[5] And whether the grace period has been triggered by notice or not is irrelevant to the question of the existence of a default.

      Here, there is no triable issue as to whether the Policy was in default when Alan Katzman died, and therefore under § 10 John Hancock is entitled to subtract the unpaid monthly deductions from the Policy's death benefit as a matter of law. The following facts are undisputed: (1) the Policy went into default on April 18, 2010, when John Hancock computed the Policy's Net Cash Surrender Value and determined that it was less than or equal to zero (PSOF ¶ 30); (2) on October 6, 2011, the Policy was reinstated retroactive to April 18, 2010 (2011 Consent Order ¶ 2), which is the date after which it was in default due to non-payment (PSOF ¶ 30); and (4) on or after October 6, 2011, Bette Katzman did not make <u>any</u> payments for

---

[5] For instance, § 10 would apply if following the Policy's termination, John Hancock agreed to reinstate it without triggering a new grace period. Section 10 would also apply if John Hancock agreed to contractually modify § 6, but not § 10.

the Policy (PSOF ¶ 55).[6]  The Policy was therefore undisputedly in default on May 25, 2014, when Alan Katzman died.  John Hancock is thus entitled as a matter of law to "deduct from the proceeds all monthly deductions due and unpaid as of the date of the Life Insured's death" (Policy § 10), which total $196,589.60 (see PSOF ¶¶ 66-67; PRSOF ¶ 20).

AK Life devotes much of its briefing on these motions to arguing that Alan Katzman did not die during a grace period.  Putting aside that there is no dispute that Alan Katzman did not die during a grace period,[7] AK Life's argument misses the point.  As explained above, the key question is whether the Policy is in default and whether payments may be deducted, and the answer is plainly yes.  AK Life's argument seeks to obtain the benefits of the Policy without assuming its minimum payment obligations.  Unsurprisingly, such a result is contrary to the Policy (which was not modified, in relevant part, by the agreement under which John Hancock reinstated it).

AK Life's various other arguments in support of its position are unavailing.  First, AK Life argues that John Hancock cannot now rely on § 10 of the Policy, since in the Amended Complaint it relied only on § 6.  However, the Amended

---

[6] The amount sent by Bette Katzman on or about July 19, 2010 was returned by John Hancock because the Policy was not in force at that time, and it therefore does not qualify as a payment.

[7] Even if the 2011 Consent Order provided for a 63-day grace period running from the date the order issued on October 6, 2011, that grace period would have expired on December 8, 2011.  And of course, by its plain terms the 63-day grace period provided for by the 2011 Consent Order runs "from the date of the Warning Notice" (2011 Consent Order ¶ 3), and it is undisputed that John Hancock did not subsequently send Bette Katzman a notice or a billing statement (PSOF ¶ 54; PRSOF ¶ 16).  Therefore, when Alan Katzman died on May 25, 2014, either the 63-day grace period provided for by the 2011 Consent Order had long since ended, or it had never begun to run.

Complaint's claim for relief is based on "the Policy terms" (see Am. Compl. ¶¶ 34-39), not just § 6.

Second, AK Life argues that because the Policy was retroactively restored to a pre-default date, it could not have subsequently entered default. But it does not follow from John Hancock's agreement to restore the Policy to a pre-default date that John Hancock also agreed that the Policy could not or would never again go into default or that premiums due and owing need never be paid. The parties have proffered no facts sufficient to establish a triable issue as to the existence of such an agreement.

Third, AK Life argues that nothing was "due and unpaid" when Alan Katzman died because John Hancock never sent a notice or a billing statement following the 2011 settlement of the New Jersey state court action. This argument misreads the Policy and the 2011 Consent Order. No term of the Policy suggests that premiums need not be paid or that monthly deductions will not be subtracted from the Policy Value occur unless the policyholder receives a notice or billing statement. Nor does the 2011 Consent Order state or imply that premiums need not be paid unless John Hancock sends a notice or billing statement—it states only that John Hancock will send a fresh notice of the minimum premium due to maintain Policy coverage, and it does not state that the sending of this notice is a condition precedent to the need to make premium payments.

Fourth, AK Life's argument that John Hancock is attempting to deplete the death benefit by paying itself "posthumous back premiums" (ECF No. 32 at 1) lacks

15

merit because the unpaid monthly deductions are not posthumous at all.  Rather, it is undisputed that the $196,589.60 that John Hancock seeks to subtract from the death benefit represents all monthly deductions due and unpaid <u>as of</u> the date Alan Katzman died.  (<u>See</u> PSOF ¶¶ 66-67; PRSOF ¶ 20.)

Lastly, AK Life's argument that under N.J.S.A. 17B:25-3, an insurer is only entitled to posthumously recoup unpaid premiums if the insured died during a grace period misreads that statutory provision, which merely permits an insurer to deduct unpaid premiums if a claim arises <u>during</u> a grace period.  N.J.S.A. 17B:25-3 does not prohibit insurers from deducting unpaid premiums when no grace period is running.

Accordingly, there is no triable issue as to whether John Hancock may deduct the unpaid monthly deductions, and the Court grants summary judgment for John Hancock as a matter of law.[8]

IV.  CONCLUSION

For the reasons set forth above, AK Life's motion for summary judgment is DENIED and John Hancock's motion for summary judgment is GRANTED.  As a matter of law, John Hancock is entitled to deduct the $196,589.60 from the Policy's $1,250,000.00 death benefit, and is therefore liable to pay AK Life and/or Bette Katzman $1,053,410.40.  As John Hancock has wired $600,000.00 to Bette Katzman and $453,410.40 to AK Life, John Hancock has fully and completely discharged its

---

[8] The Court need not reach John Hancock's argument that AK Life is not entitled to the damages it seeks because it has failed to assert a counterclaim, and because granting AK Life leave to amend its answer would be futile.  Further, because as explained above John Hancock's position is well grounded, AK life's claim to counsel fees is accordingly denied.

duty to pay the Policy's death benefit.  Accordingly, John Hancock is released, discharged, and acquitted of and from any liability of any kind whatsoever under the Policy, and Bette Katzman, Hoffman, and AK Life are hereby enjoined from instituting an action against John Hancock concerning John Hancock's liability to them under the Policy.

The Clerk of Court is directed to close the motions at ECF Nos. 31 and 38 and to terminate this action.

SO ORDERED.

Dated:	New York, New York
	June 17, 2015

_____
KATHERINE B. FORREST
United States District Judge